# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| HITACHI MEDICAL SYSTEMS AMERICA, INC., | ) ) ) | CASE NO. 5:11CV446 |
| PLAINTIFF, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) | |
| EMPIRE IMAGING, P.C., | ) ) ) | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| DEFENDANT. | ) | |

## I. THE PARTIES' CLAIMS

On March 4, 2011, Hitachi Medical Systems America, Inc. ("HMSA" or "plaintiff") filed this lawsuit against Empire Imaging, P.C. ("Empire" or "defendant"). (Doc. No. 1.) HMSA alleged that Empire breached a Service Maintenance Agreement entered into by the parties in February 2008 by failing to make the necessary monthly payments. HMSA asserted claims of breach of contract and unjust enrichment. It sought damages, attorney's fees and costs, and a declaratory judgment.[1]

On April 22, 2011, Empire filed its answer and counterclaim. (Doc. No. 9.) Empire alleged that, in October 2008, it had purchased certain medical imaging equipment from HMSA for $1,260,000.00, which included an eighteen (18) month warranty expiring on or about April 26, 2010. Pursuant to the Service Maintenance Agreement signed contemporaneously with the purchase agreement, Empire agreed to pay HMSA $120,000.00 per year, or $10,000.00 per month, for service and maintenance, with payments beginning after the expiration of the

---

[1] Although there is discussion herein of a purchase agreement also executed by the parties in 2008, HMSA is suing solely under the 2008 Service Maintenance Agreement.

warranty period. Empire alleged that it ultimately paid HMSA $1,450,000.00, which included payment for the MRI, plus a prepayment of $190,000.00 for nineteen (19) months of service and maintenance following the original eighteen (18) months of warranty, that is, through November 26, 2011. Empire alleged that, on or around November 12, 2010, HMSA breached the Service Maintenance Agreement by refusing to provide service and maintenance without additional payment.[2] Empire sought damages and a declaratory judgment.

On June 4 and 5, 2012, the Court conducted a bench trial. Having considered the testimony and evidence submitted at trial, along with the parties' post-trial submissions (Doc. Nos. 67, 68), the Court now finds facts and states conclusions of law in accordance with Fed. R. Civ. P. 52(a)(1).

## II. FINDINGS OF FACT

### A. The Parties and Jurisdiction

1.      Plaintiff HMSA is a Delaware corporation with its principal place of business in Twinsburg, Ohio. (Compl. ¶ 1.)

2.      HMSA is a distributor of magnetic resonance diagnostic imaging systems. HMSA sells and markets these systems, as well as provides service and maintenance for such systems. (Cain 754:17-21.)[3]

3.      Defendant Empire is a New York domestic professional corporation with a place of business located in Forest Hills, New York. (Compl. ¶ 2; Answer ¶ 2.)

---

[2] Whereas HMSA is suing soley under the 2008 Service Maintenance Agreement (*see* n.1, *supra*), Empire is counter-suing under both that agreement and the contemporaneously-executed purchase agreement discussed *infra*.

[3] All testimonial references are to the trial transcripts in the record at Doc. Nos. 64 and 65. Page citations are to the PageID # electronically applied by CMECF.

4.      Dr. Payam Toobian ("Toobian") is Empire's president. He has been the president for fourteen (14) years. (Toobian 693:7-9; 802:2-4.)

5.      As defendant's president, Toobian is highly compensated; he is responsible for purchasing and maintaining defendant's equipment. (Toobian 693:13-16; 817:8-11.)

6.      Although Toobian is a medical doctor with a specialty in spine and neuroradiology, he practices medicine only to a limited degree. Most of Toobian's time is spent in administering his businesses. (Toobian 693:17-694:2; 801:18-802:1; 815:15-18.)

7.      Toobian is a sophisticated, experienced businessman who has a history of negotiating commercial contracts. (Toobian 694:3-5, 13-15; 817:4-14.)

8.      By the time he purchased from HMSA, Toobian had negotiated the purchase of at least twenty (20) pieces of equipment, valued at $25,000,000.00 or more, without the assistance of lawyers. (Toobian 694:3-20.)

**B.      HMSA Negotations in General**

9.      In negotiating purchase agreements for diagnostic imaging equipment, HMSA's sales representative and the customer discuss business terms such as type of equipment, options, pricing, payment terms, warranty period, delivery and installation requirements, and whether the customer is entering into a service maintenance agreement. (Simms 662:24-663:2; Cain 741:2-742:5.)

10.      In negotiating service maintenance agreements, HMSA's sales representative and the customer discuss business terms such as service term, pricing, payment, coverage hours, level of desired coverage, parts and options discounts, and uptime guarantee. (Simms 658:16-659:4; Cain 741:13-742:5.)

11.     Customers can negotiate changes to the terms of HMSA's standard form agreements. (Cain 742:1-5; Pl.'s Ex. 1, Bates 653.[4])

**C.     The 2006 Agreement**

12.     On or about October 4, 2006, Toobian and HMSA's sales representative Larry Simms ("Simms") negotiated a purchase agreement ("the 2006 Agreement") for an Echelon™ 1.5T High Field MRI System ("the MRI"). (Simms 649:20; 650:12-15; 653:23-24; 655:5-8; Toobian 695:3-5; Pl.'s Ex. 1; Def.'s Ex. C.)[5]

13.     Contemporaneously with the 2006 Agreement, Empire and HMSA entered into a service maintenance agreement ("the 2006 SMA") by which Empire would pay HMSA $120,000.00 per year, plus tax, over a five (5) year period beginning upon the expiration of the warranty, to perform service and maintenance on the MRI. (Simms 652:9-13; Pl.'s Ex. 2.)

14.     Pursuant to the 2006 Agreement, Empire agreed to pay HMSA a total of $1,260,000.00 for the MRI. (Pl.'s Ex. 1; Def.'s Ex. C.)[6]

15.     Pursuant to the 2006 Agreement, the purchase price included eighteen (18) months of warranty for the MRI. (Toobian 832:17-21.)

16.     Toobian alleges that the purchase price under the 2006 Agreement included a $300,000.00 construction allowance for the installation of the MRI. (Toobian 807:8-13; 807:24-808:3; Pl.'s Ex. 5.) He asserts that, unless he had independent financing to cover the costs of

---

[4] Because the exhibits are not electronically filed, the page citations are the Bates numbers applied by the parties.

[5] At the same time, another company owned by Toobian, Midtown Medical Imaging ("Midtown"), was also negotiating a deal with HMSA for an identical Echelon™ MRI. For the Midtown deal, Simms negotiated with Dr. Dennis Rossi, who acted with Toobian's knowledge and authorization. The virtually simultaneous negotiations for Midtown and Empire in 2006 resulted in the same price for each Echelon™ MRI; it was that price that Toobian alleges to have renegotiated in 2008. (Toobian 700:16-24; 701:12-14; 802:14-19; 803:15-23.)

[6] The parties have a dispute about whether these two exhibits accurately express the final purchase deal. However, there is no dispute that they did enter into a purchase agreement in 2006, which was later superseded by a different agreement in 2008. Since these are not the controlling agreements, the Court cites these exhibits merely as evidence of the *fact* of the 2006 deal.

4

construction for an MRI, he always negotiated a construction allowance as part of his deals because each MRI requires particular construction. (Toobian 805:9-14; 807:11-13; 829:2-4.)

17.    HMSA denies that the 2006 Agreement included a construction allowance. (Simms 657: 10-12; Germano 719:16-19.)

18.    Toobian's assertion of a $300,000.00 construction allowance in the 2006 Agreement is not supported by credible record evidence.

19.    There are two versions of the 2006 Agreement in the record: Pl.'s Ex. 1, fully executed by all parties on October 4, 2006 and approved by HMSA on October 26, 2006, and Pl.'s Ex. 5, which is signed by Toobian and Simms,[7] but is not approved by HMSA.[8]

20.    Pl.'s Ex. 1 shows a purchase price of $1,260,000.00, which included a chiller, an MRI compatible power injector, and eighteen (18) months of warranty, but no construction allowance.

21.    Toobian asserts that he wrote "construction" on the contract (*see* Pl.'s Ex. 5) when he realized that it had been omitted by Germano, who had written the terms on the second page (Bates 651); Toobian further asserts that both he and Simms initialed this addition.

22.    There is considerable dispute over whether the initials "LS" near the "construction" term on Pl.'s Ex. 5 were made by Simms. Neither party presented a handwriting expert. The Court concludes that the "LS" initials do not match known initials written by Simms

---

[7] The date for Toobian's signature on Pl.'s Ex. 5 is over-written and, although not entirely clear, appears to be "11/14/06" rather than "10/4/06," the date on which Toobian and Simms originally signed.

[8] On the face of the 2006 Agreement, it clearly states: "This agreement shall not bind Hitachi Medical Systems America, Inc. until it has been countersigned by an authorized representative in its corporate offices in Twinsburg, Ohio." (Pl.'s Ex. 1 at Bates 649; Def.'s Ex. C at Bates 649.)

and were not written by him.[9] The disputed set of initials more closely resemble similar letters known to be written by Toobian.[10]

23.     Further, the Court finds that it is not credible that Simms would have agreed to include a construction allowance in a contract without specifying a dollar amount for the allowance.

24.      Empire began construction for the installation of the MRI in January 2007, which continued into 2008 and cost Empire more than $1 million to complete. (Toobian 697:24-698:17; 805:1-6.)

25.     The parties did not carry out the 2006 Agreement or the 2006 SMA because the construction required for installation of the MRI took until early 2008 to complete. (Germano 720:2-7; Toobian 697:24-698:17.)[11]

**D.      The 2008 Agreement**

26.     On or about February 4, 2008, Empire and HMSA renegotiated an agreement for the purchase of the MRI ("the 2008 Agreement"), the terms of which superseded the 2006 Agreement.[12] (Pl.'s Ex. 3; Def.'s Ex. E.)

---

[9] The "S" in each set of initials is the best proof that the "LS" initials near "construction" on page 2 (Bates 651) of Pl.'s Ex. 5 were not written by Simms. When Simms initials a document, the "S" that he writes is consistently very rounded. (*See, e.g.*, the "S" in "LS" on Bates 651 under the purchase price, which is known and undisputed to be Simms's writing.) Also, Simms typically uses periods after each of his initials (Simms 656:6-21), and the initials in question lack those periods.

[10] When Toobian prints an "S," it consistently looks more like a "5." (*See, e.g.*, Pl.'s Ex. 13.) The "S" in the "LS" initials on Bates 651 of Pl.'s Ex. 5 looks like a "5."

[11] Simms testified that the deal was not carried out because Toobian was "unable to fund the deal at that point." (Simms 652:18, 21-23.) However, there is no independent evidence to support this testimony. Toobian testified that he always either obtained a line of credit to cover construction or negotiated those costs into the purchase deal. There is absolutely nothing in the record to suggest that, had Toobian needed or wanted to separately finance the construction for the Echelon™ MRI, he would have been unable to do so. (Toobian 817:8-11.)

[12] *See* Paragraph 1.2 of the 2008 Agreement. (Pl.'s Ex. 3 at Bates 686.)

27.     The 2008 Agreement was executed by Toobian on behalf of Empire and by Simms and Lance Cain on behalf of HMSA.[13] (Pl.'s Ex. 3; Def.'s Ex. E.)

28.     Pursuant to the terms of the 2008 Agreement, Empire agreed to pay HMSA a total of $1,450,000.00. (Simms 681:8-11; Def.'s Ex. E.)

29.     This purchase amount included payment for the MRI, a $300,000.00 construction allowance,[14] plus six (6) months of additional warranty, for a total of eighteen (18) months of warranty. (Pl.'s Ex. 3.)

30.     The overall purchase price, as compared to the price negotiated in 2006, represented a $110,000.00 savings to Empire.

31.     The Court rejects Toobian's assertion that he paid $1,260,000.00 for the MRI, which included the $300,000.00 construction allowance, plus $190,000.00 as prepayment for ninenteen (19) additional months of service or warranty. Although Toobian insists that the 2008 Agreement originally had a different second page that contained such terms, he has failed to produce any credible evidence to support his assertion.

32.     Rather, the Court credits the testimony of Simms that, in 2008, HMSA "went back to Dr. Toobian," who "wanted a lower price at that point in time but wanted us to include construction costs in the contract[,]" and that Toobian "was negotiating with [Simms] that he wasn't going to take the deal . . . and he wanted a lower price[.]" Because Toobian "threatened to

---

[13] Lance Cain ("Cain") is the director of sales administration for HMSA. In his department, they handle all the sales quotations and the signed contracts (processing them as orders and preparing for the delivery); they also track all forecasting and order information. (Cain 736:4-20.) Cain approved the 2008 Agreement on February 18, 2008.

[14] There is no dispute that HMSA paid the $300,000.00 construction allowance in or about November 2008. (Cain 744: 21-25; Toobian 699:6-11; Pl.'s Ex. 8.) At the time the 2008 Agreement was signed, HMSA was aware that Toobian was already doing construction at Empire to accommodate the MRI they had originally bargained for in 2006. (Germano 734:23-735:3.)

buy from GE and Siemens both[,] [t]hat's one of the reasons why [HMSA] negotiated a lower price." (Simms 654:1-4; 682:3-5; 689:18-19.)

33.     Contemporaneously with the 2008 Agreement, Empire and HMSA executed a second Service Maintenance Agreement ("the 2008 SMA") by which Empire agreed to pay HMSA $120,000.00 per year, plus tax, over a five (5) year period beginning upon the expiration of the warranty, to perform service and maintenance on the MRI. (Simms 655:5-8; Pl.'s Ex. 4.)

34.     Following the expiration of the contractual warranty period, payments under the 2008 SMA were to be invoiced monthly and paid in advance. (Polon 793:13-15, 20-22; Pl.'s Ex. 4.)

35.     The 2008 SMA (Pl.'s Ex. 4) consists of four pages.

36.     The first page of the 2008 SMA (designated as page 1 of 2) contains a reference to the quotation number (LS1401S), the name of the purchaser, and identifies that it is a Service Maintenance Agreement (SMA) for the ECHELON™ 1.5 HIGH FIELD MRI SYSTEM. The first page also contains the parties' signature lines. Beneath the signature lines, in very small print (in fact, in the smallest print appearing in the SMA), and without any heading or other designation, the following provision appears:

> Upon the occurrence of any Event of Default, HMSA may, at any time, declare the unpaid balance for the remaining term of this SMA to be immediately due and payable. Any one or more of the following events shall constitute an Event of Default: (i) Customer fails to pay any monies due HMSA pursuant to this SMA; (ii) Customer becomes insolvent, a receiver is appointed for any part of the Customer's property, Customer make [sic] an assignment for the benefit of creditors, or any proceeding is commenced either by or against Customer under any bankruptcy or insolvency laws; or (iii) Customer defaults in any obligation owing HMSA pursuant to this SMA or otherwise.

37.     The reverse side of what is designated as page 1 of 2 of the 2008 SMA contains at the top of the page what is styled:

8

HITACHI MEDICAL SYSTEMS AMERICA, INC.
MRI SERVICE AGREEMENT TERMS AND CONDITIONS

There are then eleven numbered sections, arranged in two columns, that set forth the terms and conditions of the agreement.

38.     The next page of the 2008 SMA, designated as page 2 of 2, contains a schedule of services provided and related terms, as well as the contract coverage period and cost per year. The reverse side of page 2 of 2 is identical to the reverse side of page 1 of 2, again setting forth the "terms and conditions" of the SMA.

39.     Toobian never had any understanding that missing a payment would make Empire liable for the full balance under the 2008 SMA. When his lawyer told him HMSA was suing for the entire balance, he was "shocked" because he has never heard of "liquidated damages" and has never had another seller attempt to accelerate entire amounts due under service contracts. (Toobian 826:18-23; 831:8-16.)

40.     Numbered section 5 of the "terms and conditions" found on the reverse of pages 1 of 2 and 2 of 2 of the 2008 SMA provides, in its entirety, as follows:

5. CHARGES

        Charges are payable in advance upon receipt of invoice. If Purchaser requests unscheduled, on call maintenance service other than during HMSA's normal working hours or the coverage selected on this Service Agreement, such service will be furnished at HMSA's hourly rates in effect at the time service is performed.
        Purchaser shall pay HMSA, upon receipt of invoice, all travel and other expenses incurred by HMSA for service performed at Purchaser's request outside of the coverage selected in this Agreement.
        Invoices not paid within ten (10) days of the invoice date will have a 1.5 percent per month interest charge, or the highest lawful rate, whichever is less, assessed against the unpaid balance from the date of the invoice until the date of payment. Purchaser shall pay all costs involved in HMSA's collecting its overdue accounts from Purchaser including reasonable attorney's fees.
        All invoicing procedures are subject to change by HMSA at any time following the expiration of the Initial Term upon a minimum of sixty (60) days prior written notice.

9

41.     Numbered section 7 of the "terms and conditions" found on the reverse of pages 1 of 2 and 2 of 2 of the 2008 SMA provides, in its entirety, as follows:

**7.  NOTICE**

Any notice required or permitted to be given under this Agreement shall be considered sufficient if delivered personally or mailed via certified mail. Such notices directed to HMSA shall be delivered or sent to its office address set forth on the face hereof to the attention of the President. Notices to the Purchaser shall be sent to the address shown on the front of this Agreement. Notices to either HMSA or the Purchaser may be sent to such other address as either parry [sic] may give to the other from time [sic] pursuant to this provision.

**E.      The Dispute Regarding the 2008 SMA**

42.     The MRI was installed at Empire's facility in October 2008. (Toobian 698:22-25; Pl.'s Ex. 19, Bates 572.)

43.     HMSA provided Empire with eighteen (18) months of warranty, beginning October 27, 2008 and ending April 26, 2010. (Toobian 810:4-13; Def.'s Ex. F.)

44.     Toobian, however, believed that, pursuant to the terms of the 2008 Agreement, Empire had paid for an additional nineteen (19) months of service or warranty,[15] that is, through November 26, 2011. (Toobian 810:22-25.)

45.     HMSA issued the first invoice to Empire under the 2008 SMA on April 15, 2010 for service to be performed May 27, 2010 through June 26, 2010; this invoice was due by May 27, 2010. (Polon 788:17-20; Pl.'s Ex. 23, at Bates 513; Pl.'s Ex. 22.)

46.     Since April 15, 2010, HMSA has issued an invoice to Empire each month under the 2008 SMA.[16] Each invoice has included only the $10,000.00 charge for service, plus $887.50 in sales tax, for a total of $10,887.50. (Polon 786:20-22; Pl.'s Ex. 23; Toobian 806:11-19.)

---

[15] Toobian testified that, in his opinion, payment for extended warranty for the MRI and prepayment for service under the 2008 SMA are equivalent. (Toobian 823:15-824:3; 832:17-24.)

10

47.     Empire did not pay the initial invoices issued by HMSA under the 2008 SMA because it believed the MRI was still under warranty pursuant to its understanding of the terms of the 2008 Agreement. (Toobian 811:1-16.)

48.     As a result of Empire's non-payment, HMSA placed the MRI on service hold and refused to perform service under the 2008 SMA until Empire remitted payment to HMSA. (Toobian 811:18-812:5; Def.'s Ex. I.)

49.     Despite Empire's delinquent payments, no subsequent invoice included amounts for past due invoices or for any "acceleration" of charges under the provision quoted in paragraph 36, *supra*.

50.     In order to restore service, on November 30, 2010, Empire reluctantly paid several past due invoices.[17] (Toobian 813:18-814:2; Pl.'s Ex. 22.) Empire has continued to pay the invoices, but only once on the actual due date. In turn, Hitachi has continued to accept all of Empire's payments. (Pl.'s Ex. 22.)

51.     On or about December 1, 2010, Toobian sent a letter to HMSA disputing the authenticity of the second page of the 2008 Agreement, which had been relied upon by HMSA, because the terms were initialed only by HMSA and did not reflect the additional warranty/service for which Empire believed it had paid. (Toobian 813:4-17; Def.'s Ex. G.)[18]

---

[16] Each invoice was issued approximately six weeks in advance of its due date, which was the beginning date of the period for which Empire was being billed. Under the 2008 SMA, Empire was to pay for services in advance. For example, the invoice issued on April 15, 2010 was due on May 27, 2010 and was for the service period covering May 27, 2010 through June 26, 2010. (Pl.'s Ex. 23.)

[17] On November 30, 2010, Empire paid five past due invoices that had been due on May 27, 2010, June 27, 2010, July 27, 2010, August 27, 2010, and September 27, 2010, still leaving unpaid two invoices that had been due on October 27, 2010 and November 27, 2010. (Pl.'s Ex. 22; Def.s Ex I, Bates 544.)

[18] This letter is somewhat confusing. Although cited by Toobian at trial as the letter he wrote to HMSA to complain about Empire's 2008 SMA, the letterhead is for "America's Imaging Center, Inc." The return address on the letter is Empire's address. There is nothing in the record to explain this discrepancy. The letter also references an attachment which, had it actually been attached to the exhibit, might have helped to clear up this issue. Although plaintiff did not object to the letter, plaintiff's counsel did elicit testimony from Toobian that the letter refers to a payment of an

52.     On or about March 1, 2011, Empire again demanded in writing that HMSA provide the nineteen (19) months of additional warranty/service for which Empire believed it had paid under the 2008 Agreement, plus an amount for "emergency repair." (Toobian 814:11-25; Def.'s Ex. H.)

53.     HMSA filed this lawsuit against Empire on March 4, 2011. (Doc. No. 1.) At the time, there were five past due invoices on Empire's account under the 2008 SMA. (Polon 788:21-789:2.) As of the time of trial, none of the invoices that were past due when the complaint was filed were outstanding. Rather, there was only one past due invoice under the 2008 SMA, due seven (7) days earlier on May 27, 2012, for a total delinquent balance of $10,887.50. (Polon 793:4-795:23; Pl.'s Exs. 23, 23-5.)

54.     Empire answered and counterclaimed against HMSA on April 22, 2011. (Doc. No. 9.)

### III. CONCLUSIONS OF LAW

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as HMSA and Empire are citizens of different states and the amount in controversy exceeds $75,000.00.[19]

2.      Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (a)(3) and because Empire consented to venue in this Court in the 2008 agreements.

---

extra $200,000.00 for twenty (20) additional months of service, whereas Toobian's claim throughout this case has been that he paid $190,000.00 for an extra nineteen (19) months of service. (Toobian 829:20-830:15.) Toobian claimed he had merely "approximated." In light of these discrepancies, the Court places little weight on Def.'s Ex. G as evidence.

[19] Although the evidence at trial ultimately revealed only one unpaid invoice for $10,887.50, the allegations of the complaint clearly envisioned damages in excess of the jurisdictional amount, including "all costs involved in HMSA's collecting its overdue accounts from Purchaser including reasonable attorney's fees." (Pl.'s Ex. 4 at Bates 717, ¶ 5.)

3.      To establish a claim for breach of contract,[20] a party is required to prove: (a) the existence of a contract; (b) that the party claiming breach performed its contractual obligations; (c) that the other party breached its contractual obligations; and (d) that the non-breaching party suffered damages or loss as a result of the breach. *Siemaszko v. FirstEnergy Nuclear Operating Co.*, 932 N.E.2d 414, 419 (Ohio Ct. App. 2010).

4.      The 2008 Agreement and the 2008 SMA must be read and construed in conjunction with each other.

5.      The 2008 SMA (Pl.'s Ex. 4) is a valid and binding contract, except for the provision in small print on the front page under the executing signatures.

6.      Although this provision, quoted in the Findings of Fact at ¶ 36, has been referred to by the parties both as an "acceleration clause" and as a "liquidated damages clause," looking at the provision in its entirety, the Court concludes that it is more in the nature of a "liquidated damages" clause.[21] That said, under either construction of the clause, plaintiff cannot prevail.

7.      If the provision is considered an acceleration clause, Empire would not have been in default, despite unpaid installments, because there is no evidence in the record that HMSA

---

[20] Because this matter is resolved on the breach of contract claim, there is no need to address the alternative unjust enrichment claim and the same is dismissed. *Aultman Hosp. Ass'n. v. Cmty. Mut. Ins. Co.*, 544 N.E.2d 920, 924 (Ohio 1989) (where there is an express contract, "in the absence of fraud, illegality, or bad faith, [a party is] entitled to compensation only in accordance with the terms of the written agreement.") (citing *Ullman v. May*, 72 N.E.2d 63, 67 (Ohio 1947) (Syllabus ¶ 3)).

[21] Acceleration clauses are typically found in loan agreements where a particular amount of money is payable in installments and where the default on one installment renders the entire debt immediately due. *See* Black's Law Dictionary (9th ed. 2009) (defining "acceleration clause" as "[a] loan-agreement provision that requires the debtor to pay off the balance sooner than the due date if some specified event occurs, such as failure to pay an installment or to maintain insurance."). In such circumstances, if the debt is accelerated, once the defaulting party pays in full, the agreement is terminated because the performance on both sides has been completed. In contrast, here, even if defendant were to pay the entire "accelerated" amount, plaintiff's counsel has acknowledged that HMSA would continue to perform services for the entire term of the 2008 SMA, i.e., that the 2008 SMA would not be terminated. (*See* Closing Arg. 842: 2-8; *Link v. Wabash R.R.*, 370 U.S. 633-34 (1962) ("each party is deemed bound by the acts of his lawyer-agent")).

13

properly invoked the provision by exercising its *option* under the language of the clause (i.e., "HMSA may . . . ") to accelerate due to the occurrence of an event of default. *See Dennis v. Rotter*, 183 N.E. 188, 189 (Ohio Ct. App. 1932) (because option to accelerate was never exercised, assignee of mortgage and note was bona fide holder in due course); *Taylor v. Quinn*, 39 N.E. 2d 627, 629 (Ohio Ct. App. 1941) (exercise of acceleration clause was optional and had not occurred at the time the right accrued); *Acme Cleveland Corp. v. Trayco Elec. Co.*, 499 N.E.2d 930, 930 (Clev. Mun. Ct. 1983) (some affirmative action by holder of promissory note showing election to accelerate required).

8.      Although the filing of a lawsuit can constitute notice of intent to accelerate, *see, e.g.*, *Gaul v. Olympia Fitness Center, Inc.*, 623 N.E.2d 1281, 1287 (Ohio Ct. App. 1993), in this case, the complaint itself does not evince any intent to accelerate; it simply seeks six-figure damages "according to the terms of the [2008] SMA." (Compl. ¶ 11.)

9.      Even if the filing of the complaint were to be construed broadly as HMSA's notice to Empire of its intent to accelerate on account of past-due invoices, HMSA subsequently waived whatever right it may have had to accelerate by accepting Empire's payment of most of those delinquent invoices. *See, e.g.*, *Rosselot v. Heimbrock*, 561 N.E.2d 555, 559 (Ohio Ct. App. 1988) (failure to inform of intent to accelerate or to return payments made to cure a default constituted a waiver, notwithstanding the filing of a complaint).

10.     In addition, even prior to filing the complaint, HMSA had frequently accepted late payments from Empire without attempting to enforce the "acceleration clause." This constituted a waiver of HMSA's rights. *See, e.g.*, *Milbourn v. Aska*, 77 N.E.2d 619, 621 (Ohio Ct. App. 1946) ("[w]hen a landlord, by a course of dealing in accepting overdue rent, has put a tenant off his guard, a forfeiture of the lease for a delayed payment of rent cannot be enforced, unless

14

notice has been given to the tenant calling on him for a compliance with the strict terms of the lease").

11.     Accordingly, for the reasons stated above, even if the provision in question is a true "acceleration clause," HMSA's attempt to rely upon it is to no avail.

12.     HMSA also cannot prevail under the Court's interpretation of the clause as a "liquidated damages" clause, even though Ohio law recognizes the validity and enforceability of such clauses in contracts under certain circumstances.

13.     "Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof." *Samson Sales, Inc. v. Honeywell, Inc.*, 465 N.E.2d 392 (Ohio 1984) (Syllabus) (following paragraph two of the syllabus of *Jones v. Stevens*, 146 N.E. 894 (Ohio 1925)).[22]

---

[22] In *Samson Sales*, defendant Honeywell, Inc. entered into a contract with plaintiff Samson Sales, Inc. under which Honeywell would provide burglar alarm services in exchange for $1500 at installation plus $150 per month for five years. During the term of the contract, a burglary occurred, but Honeywell failed to transmit a burglar alarm to the local police. Samson Sales sued alleging breach of contract and seeking damages in the amount of $68,303 for loss of merchandise occasioned by the burglary. Honeywell refused to pay more than $50 toward the loss, relying on a liquidated damages provision in the contract. The Supreme Court of Ohio concluded, in agreement with the court of appeals, that "the minute type used in the standard contract issued by [Honeywell], as well as a fair construction of the contract provision as a whole, fails to evince a conscious intention of the parties to consider, estimate, or adjust the damages that might reasonably flow from the negligent breach of the agreement." *Samson Sales*, 465 N.E.2d at 394. The court expressly noted: "Surely, Samson, which apparently had some business experience, did not pay $10,500 for the mere possibility of recouping $50 if Honeywell provided no service at all under the terms of the contract. Characteristically, therefore, and by way of analysis, the nominal amount set forth in the contract between Samson and Honeywell has the nature and appearance of a penalty." *Id.*

14.     For a contract provision to be construed as a liquidated damages clause, and not a penalty, all three conditions of the *Samson Sales* test must be met. *Kurtz v. W. Property, LLC*, No. 10AP-1099, 2011 WL 6916196, at *6 (Ohio Ct. App. Dec. 27, 2011) ("The tripartite test of *Samson Sales* is stated in the conjunctive, and, hence, all three elements must be met.") (citation omitted).

15.     "Whether a particular sum specified in a contract is intended as a penalty or as liquidated damages depends upon the operative facts and circumstances surrounding each particular case," *Samson Sales*, 465 N.E.2d at 394, and that determination "necessarily involves analysis of the facts of the particular case." *Cad Cam, Inc. v. Underwood*, 521 N.E.2d 498, 503 (Ohio Ct. App. 1987).

16.     "The determination of whether a liquidated damages provision is an unenforceable penalty is a matter of law to be determined by the Court in light of all the circumstances." *Easton Telecom Servs., LLC v. CoreComm Internet Group, Inc.*, 216 F. Supp. 2d 695, 699 (N.D. Ohio 2002).

17.      "[R]easonable compensation for actual damages is the legitimate objective of . . . liquidated damage provisions and where the amount specified is manifestly inequitable and unrealistic, courts will ordinarily regard it as a penalty." *Samson Sales*, 465 N.E.2d at 393-94.

18.     Liquidated damages are intended to reflect an "estimation and adjustment" of actual damages in the event of a breach. "The 'estimation and adjustment' requirement of the [*Samson Sales*] test is a threshold burden" on the party seeking to enforce the liquidated damages clause. *Easton Telecom Servs. v. CoreComm Internet Grp.*, 216 F. Supp. 2d at 698 (determining on summary judgment that a liquidated damages clause was an unenforceable penalty under Ohio law).

16

19.     There is no evidence here that the parties ever negotiated or bargained for this provision of the 2008 SMA or that it reflects an "estimation" of HMSA's actual damages in the event of a breach by Empire, as required by *Samson Sales*.

20.     Further, if this provision were to apply, the liquidated damages would be determined by multiplying the number of payments due on the remainder of the 2008 SMA following a breach by the monthly contractual payment. This would be true whether the breach occurred after the first month of the contract or during the fifth and final year of the contract. There would be no "adjustment" (e.g., for present value), which is also a requirement of *Samson Sales*.

21.     Such damages would be "manifestly unconscionable, unreasonable, and disproportionate in amount." *See Samson Sales* (Syllabus).[23] *See also Easton*, 216 F. Supp. 2d at 698 ("the fact that the liquidated damages provision calls for immediate payment of the full amount otherwise due if the contract had not been breached and does not allow for any reduction for present value, is further evidence that no real 'estimation or adjustment' ever took place between the parties concerning this clause").

22.     The Court concludes that HMSA has not met its "threshold burden" of establishing that: 1) the liquidated damages clause was established through bargaining and expressed the true intent of the parties; 2) the amount was ascertained by estimation and adjustment; 3) actual damages would be uncertain of amount and difficult to prove; and, 4) the amount of liquidated damages is not unconscionable, unreasonable, and disproportionate.

---

[23] This is especially true in light of another contract provision which limits *defendant's* damages in the event of a breach by HMSA to "the amounts paid by Purchaser to HMSA" under the 2008 SMA. (Pl.'s Ex. 4, at Bates 717, ¶ 11.) In other words, if Empire made *one* monthly payment under the 2008 SMA and, thereafter, HMSA inexplicably stopped providing maintenance and service, causing defendant to stop paying, arguably Empire could recover only its one-month's payment as damages for HMSA's breach, whereas HMSA could recover the entire balance on the 5-year 2008 SMA for a breach by Empire. This is certainly unconscionable.

17

23.     Therefore, the liquidated damages provision in the 2008 SMA is void under Ohio law as an unenforceable penalty.[24]

24.     HMSA has fulfilled its contractual obligations under the 2008 SMA. There is no evidence to support Empire's assertion that the $1,450,000.00 it paid for the MRI included $190,000.00 as prepayment for nineteen (19) months of service and maintenance. HMSA's failure to provide nineteen (19) additional months of service and maintenance before beginning to invoice Empire was not a breach of contract.

25.     Empire's payment obligation under the 2008 SMA was a material term of the contract.

---

[24] To further clarify its reasoning, the Court also notes that, although quoting the test set forth by the Ohio Supreme Court in *Jones v. Stevens*, 146 N.E. 894 (Ohio 1925) (Syllabus), for "determin[ing] whether a sum named in a contract is intended as a penalty or as liquidated damages," *Samson Sales* was actually a case involving a limitation of liability clause. *See Nahra v. Honeywell, Inc.*, 892 F. Supp. 962, 969 (N.D. Ohio 1995) (noting that Ohio courts have "blurred the distinction between the law governing the enforceability of *liquidated damages* clauses and the law applicable to related, but distinct, *limitation* of liability clauses.") (emphases in original). "Liquidated damages clauses, properly employed, attempt to fix in advance 'reasonable compensation for actual damages.'" *Id.* "However, limitation of liability clauses by definition restrict the amount of compensation available, regardless of the actual damages ultimately suffered." *Id.*

    *Jones* better illustrates the nature and purpose of a liquidated damages clause. In *Jones*, plaintiff was a very successful restaurant owner who leased space to operate his restaurant. Several years before his lease expired, he entered into a contract with defendant to operate the restaurant on his behalf. Jones and Stevens negotiated a detailed contract setting forth their mutual expectations regarding all aspects of the business, including liquidated damages for the loss of good will should Stevens breach the contract. As it turned out, Stevens abandoned the restaurant, and Jones, despite his best efforts, was unable to restore it to its previous profitability. He sued for damages, including the agreed upon liquidated damages for loss of good will. The court in *Jones* reversed a lower court's determination that the liquidated damages amounted to a penalty. The court noted that good will is an actual business asset, the value of which "only those who are versed in the requirements, opportunities, and exigencies of a business are qualified with any accuracy to estimate[.]" 146 N.E. at 897. It concluded that the parties were "both experienced restaurant men" and that the sum they had fixed in liquidated damages for loss of good will "was [not] so unreasonable and disproportionate as to justify the conclusion that it did not express the true intention of the parties at the time it was made[.]" *Id.*

    This recitation makes apparent why *Jones* actually offers more guidance than *Samson Sales*. It shows how different the contract provision was in *Samson Sales*, where the intent was to limit the liability of the burglar alarm company should there be a burglary and subsequent loss, despite the installation and operation of the alarm system. The limitation was to apply whether based on negligence or on breach of contract.

18

26.     Empire was required to pay, in advance, $10,000.00 for a month of service and maintenance, plus sales tax of $887.50.[25]

27.     When Empire violated its contractual obligation under the 2008 SMA by failing to timely pay an invoice, HMSA was within its rights to place the MRI on service hold; this action did not constitute a breach of contract.

28.     The 2008 SMA provided that "invoices not paid within ten (10) days of the invoice date will have a 1.5 percent per month interest charge, or the highest lawful rate, whichever is less, assessed against the unpaid balance from the date of the invoice until the date of payment. Purchaser shall pay all costs involved in HMSA's collecting its overdue accounts from Purchaser including reasonable attorney's fees." (Pl.'s Ex. 4, Bates 719, ¶ 5.)

29.     Empire has not fulfilled its contractual obligations under the 2008 SMA because, at the time of trial, there was one past due invoice payable under the 2008 SMA, for a total of $10,887.50, representing $10,000.00 plus $887.50 in sales tax, for service and maintenance which was to be performed from May 27 through June 26, 2012. The invoice had been due on May 27, 2012. At the time of trial, it was unpaid.[26]

30.     HMSA is entitled to recover on the unpaid invoice referenced above, with interest as due under the 2008 SMA, plus reasonable attorney's fees related to this action which it brought to "collect[ ] its overdue accounts from [Empire]." (Pl.'s Ex. 4, Bates 719, ¶ 5.)

---

[25] Clearly, $190,000.00 would not have been sufficient to cover nineteen (19) monthly payments *plus tax*.

[26] Although, in the past, Empire paid several invoices late, HMSA never assessed any interest when Empire finally made its payments. Accordingly, the Court concludes that HMSA has waived any right to retroactively assess any interest on invoices that had been past due but were paid by the time of trial.

31.    Empire did not meet its burden of establishing that HMSA breached the 2008 Agreement and/or the 2008 SMA.[27]

## IV. CONCLUSION

For the reasons set forth above, as supported by the findings of fact and conclusions of law, this entire case is hereby **DISMISSED** according to the terms set forth herein.

**IT IS SO ORDERED**.

Dated: March 26, 2013

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[27] Although the 2008 SMA does not contain a severability or savings clause, neither party has argued that the entire contract is unenforceable if the acceleration/liquidated damages clause is unenforceable.  To the contrary, both sides have argued for enforcement for different reasons. Therefore, since severability has not been raised, the Court need not address it.

20